

## NUMBER 13-07-00136-CR

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI – EDINBURG

JUSTIN MARTINEZ,                                                    Appellant,

v.

THE STATE OF TEXAS,                                                Appellee.

**On appeal from the 214th District Court of Nueces County, Texas.**

# MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Yañez and Benavides**
**Memorandum Opinion by Justice Benavides**

Justin Martinez, the appellant, was charged by a grand jury with burglary of a habitation with the intent to commit theft. *See* TEX. PENAL CODE ANN. § 30.02 (Vernon 2003). The indictment included a repeat felony offender enhancement. *See id.* § 12.42 (Vernon Supp. 2008). On February 6, 2007, a jury found him guilty of burglary of a

habitation. *See id.* § 30.02. The jury assessed punishment of seventeen years in prison. The trial court denied Justin's motion for new trial.[1] Justin raises two issues on appeal: (1) whether the evidence was factually sufficient to support the conviction; and (2) whether the trial court abused its discretion in denying his motion for new trial. We affirm.

## I. FACTUAL SUFFICIENCY

In his first issue on appeal, Justin argues that the identification testimony presented at trial was insufficiently certain to justify the jury's verdict. The identification testimony, placing Justin at the scene on the day in question, changed through the course of the investigation. Justin asserts that the evidence is factually insufficient because "this type of vacillating testimony is not reliable enough to prove the [a]ppellant guilty beyond a reasonable doubt." We disagree.

## A. Standard of Review

When performing a factual sufficiency review, we review all of the evidence in a neutral light. *Watson v. State*, 240 S.W.3d 404, 414 (Tex. Crim. App. 2006). We must (1) review the evidence submitted in support of the verdict to determine whether, though legally sufficient, it is "'so weak' that the jury's verdict seems 'clearly wrong and manifestly unjust,'" and (2) considering conflicting evidence, determine whether "the jury's verdict, though legally sufficient, is nevertheless against the great weight and preponderance of the evidence." *Id.* at 414-15 (internal citations omitted). A jury verdict is clearly wrong and manifestly unjust when it "'shocks the conscience'" or "'clearly demonstrates bias.'" *Zuniga v. State*, 144 S.W.3d 477, 481 (Tex. Crim. App. 2004), *overruled on other grounds by*

---

[1] In this case, there are three Cansecos and two Martinezes; we will refer to each person by his or her first name to avoid confusion.

*Watson*, 204 S.W.3d at 405, 417. To a very limited extent, we may substitute our judgment for that of the jury on determinations of credibility and weight. *Marshall v. State*, 210 S.W.3d 618, 625 (Tex. Crim. App. 2006). However, we may not reverse a fact finder's decision merely because we would have decided differently or disagree with the result. *See Cain v. State*, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).

## B.    Discussion

Miguel Canseco, the victim in this case, testified for the State. On September 4, 2006, in the late afternoon while he was away from his home, Miguel's house was broken into, and several items belonging to him were removed, including two televisions, men's clothing, approximately $800 in cash, and other items.

During the time these events occurred, Miguel was exercising his visitation rights with his two-year-old daughter whose mother is Valerie Martinez.[2] Miguel typically would pick his daughter up at Valerie's house and return her to the house later in the day.

On September 4, 2006, Valerie was not at home when Miguel attempted to return his daughter at the end of his time with her. He was finally able to meet Valerie sometime around 5:00 p.m. that afternoon. After dropping his daughter off with Valerie, he went to his mother's house, where he found his mother and sister visibly upset. Thirty minutes later, he returned to his own home and found the front door kicked in and the house ransacked.

Genesis Canseco, Miguel's sister, testified that on September 4, 2006, she was living with her mother. That afternoon, upon hearing a knock, she answered the door.

---

[2] Valerie Martinez and Justin Martinez are not related to each other by blood or by marriage. They do, however, have two other children together.

Justin Martinez was at the door. Genesis knew Justin through Valerie. He appeared mad and wanted to see her brother, Miguel. Genesis told Justin that Miguel was not there. Justin seemed very upset, was yelling and gesturing, and was demanding that Genesis tell him where to find Miguel. She saw a male passenger in the car that Justin had arrived in, but he never got out of the car. Before he left, Justin said, "You better tell [Miguel] to stay away from Valerie."

Gina Canseco, Miguel's mother, also testified. Gina said that, when Justin came to the door of her house on September 4, 2006, "[h]e was very upset" and was threatening Miguel. She was afraid for her son's safety. She told Miguel about Justin's actions and threats before Miguel left her house on September 4, 2006.

Juan David Alvarado, then Miguel's neighbor, testified he was at home cooking supper on September 4, 2006. He heard a loud noise, looked out his kitchen window, and saw a car backed up into the driveway by Miguel's house. He saw someone who resembled Miguel place a television inside the car. Because these events occurred during daylight hours, Alvarado thought it was Miguel placing the television in the car, and thought Miguel must be moving out of the house. Later, Alvarado identified Justin from a photo lineup as the man who he saw at Miguel's house carrying the television. Alvarado also pointed Justin out at trial as one of the men he had seen at Miguel's house that day.

Sergeant James Lerma, a patrolman with seven years experience with the Corpus Christi Police Department, was dispatched to Miguel's house to "take the initial report." Miguel met him outside the house, and while speaking with Lerma, confirmed the dispatch call. Lerma also spoke with Gina Canseco, Miguel's mother, who was "very upset" when he talked with her. Lerma walked the scene, noticed that the house had been ransacked,

4

and "could tell [the front door] had been kicked open." Lerma also noticed that a dresser looked as though a television had been removed from it and a cable line had been disconnected. Lerma tried to contact some neighbors, but none were available. Lerma "called [the] identification section to come and process the scene."

Diego Rivera, a crime scene technician with the Corpus Christi Police Department, responded to Lerma's call. Rivera examined the house, specifically looking for fingerprints on the dresser and its top, a nightstand top, and the front door. Rivera was unable to find any fingerprints.

Valerie Martinez testified on Justin's behalf. At one point, she was Justin's neighbor, which explains how they met. She and Miguel had an "off-again-on-again" relationship, and when the relationship was "off," she sometimes would date Justin. During 2006, she occasionally lived with Miguel at his house, including during the summer of 2006, but did not live there during September 2006.

According to Miguel, Valerie never had a key to his house, though she claimed she did. On September 4, 2006, she asked Justin to take her to Miguel's house to pick up some of her "stuff," items Miguel had supposedly taken from her while she was not living with him. Justin picked her up in his mother's car, and he had a friend with him. When they arrived at Miguel's house, according to Valerie, the front door was unlocked, so she did not need to use her key. She noticed no damage to the door or its frame, and it was unnecessary to break down the door to get inside. She testified that no one accidently knocked the door off its frame. Valerie went through the closet and drawers to find her things, and also removed two television sets her mother had purchased for her. She did not "ransack" the house nor did she see or remove any cash. As a matter of fact, she

testified, if Miguel had any money, he would have kept it in the bank. Valerie also stated that Miguel is a very jealous person. On cross-examination, Valerie confirmed that she had never spoken to the police or the district attorney's office about the story she was telling during the trial. However, Valerie had not been hiding or avoiding the police or district attorney's office.

There was ample testimony placing Justin at the scene of the crime. Valerie's testimony provides an explanation for some, but not all, of the items missing from the home. Viewing all of the evidence in a neutral light, we cannot say that the evidence is "'so weak' that the jury's verdict seems 'clearly wrong and manifestly unjust,'" nor can we say that "the jury's verdict, though legally sufficient, is nevertheless against the great weight and preponderance of the evidence." *See Watson*, 240 S.W.3d at 414-15. We overrule Justin's first issue.

## II. MOTION FOR NEW TRIAL

Justin filed a motion for new trial, arguing that an unauthorized conversation between Rivera, Officer Lerma, and two jurors occurred. Justin argues that the conversation violated article 36.22 of the code of criminal procedure, which prohibits conversations with jurors "about the case on trial except in the presence and by the permission of the court." *See* TEX. CODE CRIM. PROC. ANN. art. 36.22 (Vernon 2006). The trial court denied the motion, but decided to punish Lerma and Rivera by suspended fines.[3] Justin argues that the trial court committed error by denying his motion for new trial.

---

[3] *See* TEX. CODE CRIM. PROC. ANN. art. 36.22 (Vernon 2006) (providing the punishments that are available for violating article 36.22).

## A.      Standard of Review

We apply the abuse of discretion standard when reviewing a trial court's decision on a motion for new trial.  *Charles v. State*, 146 S.W.3d 204, 208 (Tex. Crim. App. 2004). Without substituting our judgment for the trial court's, we must determine whether the trial court's decision was unreasonable or arbitrary.  *Id.* at 208.  We (1) view the evidence in the light most favorable to the ruling, and (2) "presume that all reasonable factual findings that could have been made against the losing party were made against that losing party."  *Id.* at 208.  We "must defer to any reasonable implied factual findings that the trial court might have made in denying a motion for new trial."  *Id.* at 211.  "The trial court is the sole judge of the credibility of the testifying jurors.  Where there is conflicting evidence on an issue of fact as to jury misconduct, the trial judge determines the issue and there is no abuse of discretion in overruling the motion for new trial."  *Salazar v. State*, 38 S.W.3d 141, 148 (Tex. Crim. App. 2001).

An unauthorized conversation about the case between a juror and another person gives rise to a presumption of injury to the defendant and a new trial may be in order. *Quinn v. State*, 958 S.W.2d 395, 401 (Tex. Crim. App. 1997).  However, the State may rebut the presumption of harm.  *Id.*  A new trial will not be warranted unless there has been injury to the defendant.  *Thomas v. State*, 699 S.W.2d 845, 853 (Tex. Crim. App. 1985). "Examples of methods of proving there has been no injury include a showing by the State that the case was not discussed or a showing that nothing prejudicial to the accused was said."  *Id.*  We will find that a trial court has abused its discretion in denying a motion for new trial "only when no reasonable view of the record could support the trial court's ruling." *Id.* at 208.

**B.    Discussion**

During a post-trial hearing, Diana Amesquita, a juror in the case, explained that during the guilt or innocence phase, she and another juror were riding in the elevator with Lerma and Rivera following their testimony.  Rivera allegedly said to them, "Ladies, did I dazzle you?"  The two jurors responded that they were not allowed to discuss anything.  Lerma then said, "Ah, so they invoked the rule."  Then, the jurors reiterated that they were not able to discuss anything, and, according to Amesquita, Lerma replied, "It's weird that at the grand jury you can discuss almost anything."

Amesquita was the only juror to testify at the post-trial hearing.  She said she thought that Rivera was merely flirting with her and the other juror in the elevator, who was also a female.  She confirmed that none of the comments or conversations influenced her in reaching a decision regarding Justin's guilt or innocence or during the sentencing phase.  She did not give greater weight to the State's evidence or to Justin's evidence as a result of Rivera's comment.  She did not consider Lerma's comments to imply that there was additional information about the case that he was not allowed to raise in his testimony.  Amesquita and the other juror did not discuss these comments between themselves nor with other jurors.  Amesquita did not know whether the comments had an effect on the other juror's decisions at either phase of the trial.

Without substituting our judgment for the trial court's, viewing the evidence in the light most favorable to the ruling, and "presum[ing] that all reasonable factual findings that could have been made against the losing party were made against that losing party," we hold that the trial court did not abuse its discretion in overruling Justin's motion for new trial.  *See Charles*, 146 S.W.3d at 208.  Here, the trial court determined, as the sole judge of

Amesquita's credibility, that no misconduct had occurred. *See Salazar*, 38 S.W.3d at 148. The State successfully rebutted the presumption of injury to Justin by demonstrating that nothing prejudicial to him was discussed. *See Thomas*, 699 S.W.2d at 853. The trial court impliedly found, by denying the motion for new trial, that no injury to Justin occurred, even though the trial court decided to punish Lerma and Rivera, and we must defer to the implied finding. *See Charles*, 146 S.W.3d at 211. We cannot find that "no reasonable view of the record could support the trial court's ruling," *id.* at 208; therefore, we overrule Justin's second issue.

### III.   CONCLUSION

Having overruled both of Justin's issues on appeal, we affirm the trial court's judgment.

_____
GINA M. BENAVIDES,
Justice

Do not publish.
See TEX. R. APP. P. 47.2(b)

Memorandum Opinion delivered and
filed this the 26th day of February, 2009.

9